ROB BONTA
Attorney General of California
R. MATTHEW WISE
JOHN D. ECHEVERRIA
Supervising Deputy Attorneys General
KEVIN L. QUADE
Deputy Attorney General
State Bar No. 285197
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7693
  Fax: (916) 324-8835
  E-mail: Kevin.Quade@doj.ca.gov
*Attorneys for Defendant Attorney General*
*Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GARY R. SANCHEZ,**<br><br>Plaintiff,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | 24-cv-767-RSH-MSB<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Date:         July 29, 2024<br><br>Courtroom:  3B<br>Judge:      The Honorable<br>             Robert S. Huie<br>Trial Date:  n/a<br>Action Filed:  April 29, 2024 |

# TABLE OF CONTENTS

**Page**

Introduction................................................................................................... 1

Background .................................................................................................... 2

Legal Standard .............................................................................................. 3

Argument ....................................................................................................... 4

    I.      Plaintiff Cannot Establish that Silencers Are Presumptively Protected by the Second Amendment ...................................... 4

          A.    Silencers Are Not "Arms" ......................................... 5

          B.    Plaintiff Cannot Adequately Plead Facts Sufficient to Demonstrate that Silencers Are In Common Use for Self Defense and Not Dangerous and Unusual.................................. 9

              1.    Common Use for Self-Defense ..................................... 10

              2.    Dangerous and Unusual ................................................ 12

    II.     California's Prohibition on Silencers Is Consistent with This Nation's History and Tradition of Firearms Regulation...................... 14

Conclusion ................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ....................................................................... 3, 8

*B&L Prods., Inc. v. Newsom*
    __ F.4th __ 2024 WL 2927734 (9th Cir. June 11, 2024) ...................... 1, 4, 7, 11

*Bevis v. City of Naperville* (*Bevis I*)
    657 F. Supp. 3d 1052 (N.D. Ill. 2023) ...................................... 16, 17, 19, 20

*Capen v. Campbell*
    __F. Supp. 3d __, 2023 WL 8851005 (D. Mass. Dec. 21, 2023) ................... 6, 8

*Cholla Ready Mix, Inc. v. Civish*
    382 F.3d 969 (9th Cir. 2004) ...................................................... 3

*Cox v. United States*
    2023 WL 4203261 (D. Alaska June 27, 2023) ...................................... 8

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
    (*DSSA*)
    664 F. Supp. 3d 584 (D. Del. 2023) ....................................... 18, 19, 20

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ...................................................... *passim*

*Firearms Regul. Account. Coal., Inc. v. Garland*
    __F. Supp. 3d __, 2023 WL 5942365  (D.N.D. Sept. 12, 2023) ...................... 8

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015) ...................................................... 7, 12

*Garland v. Cargill*
    __ U.S. __, 2024 WL 2981505 (June 14, 2024) .................................... 20

*Hill v. State*
    53 Ga. 472 (1874) ...................................................... 19

*Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*)
    685 F. Supp. 3d 63 (D. Conn. 2023) ....................................... 12

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

*New York State Rifle & Pistol Ass'n v. Bruen*
    597 U.S. 1 (2022) ...................................................................*passim*

*Nunn v. State*
    1 Ga. 243 (1846)......................................................................... 19

*Ocean State Tactical, LLC v. Rhode Island*
    95 F.4th 38 (1st Cir. 2024) ......................................................... 21

*Or. Firearms Fed'n v. Kotek*
    682 F. Supp. 3d 874 (D. Or. 2023)..........................................*passim*

*Rupp v. Bonta*
    2024 WL 1142061 (C.D. Cal. Mar. 15, 2024) ................................ 19

*S.D. Myers, Inc. v. City & Cnty. of San Francisco*
    253 F.3d 461 (9th Cir. 2001)......................................................... 4

*Second Amendment Found., Inc. v. Bureau of Alcohol, Tobacco,*
    *Firearms and Explosives*
    __F. Supp. 3d __, 2023 WL 7490149 (N.D. Tex. Nov. 13, 2023)....................... 8

*Starr v. Baca*
    652 F.3d 1202 (9th Cir. 2011)....................................................... 8

*State v. Reid*
    1 Ala. 612 (1840)........................................................................ 18

*Teixeira v. Cnty. of Alameda*
    873 F.3d 670 (9th Cir. 2017) (en banc)............................................ 7

*United States v. Al-Azhari*
    2020 WL 7334512 (M.D. Fl. Dec. 14, 2020)..................................... 8

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023)................................................ 5, 10, 11

*United States v. Berger*
    __ F. Supp. 3d __, 2024 WL 449247 (E.D. Pa. Feb. 6, 2024) ......................... 7, 8

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Comeaux*
2024 WL 115929 (W.D. La. Jan. 10, 2024)......................................12, 13, 20, 21

*United States v. Cooperman*
2023 WL 4762710 (N.D. Ill. July 26, 2023) ................................................. 8

*United States v. Cox*
906 F.3d 1170 (10th Cir. 2018)................................................................. 6, 7

*United States v. Grey*
2018 WL 4403979 (C.D. Cal. Sept. 13, 2018)................................................ 13

*United States v. Hasson*
2019 WL 4573424 (D. Md. Sept. 20, 2019)................................................... 8

*United States v. McCartney*
357 F. App'x 73 (9th Cir. 2009)............................................................ 12, 13

*United States v. Miller*
307 U.S. 174 (1939) ................................................................................ 7

*United States v. Perez-Garcia*
96 F.4th 1166 (9th Cir. 2024)........................................................... 5, 10, 13

*United States v. Perkins*
2008 WL 4372821 (D. Neb. Sept. 23, 2008) ............................................... 13

*United States v. Peterson*
2023 WL 5383664 (E.D. La. Aug. 21, 2023)................................................. 8

*United States v. Rahimi*
602 U.S. __ (June 21, 2024)............................................................ 4, 14, 20

*United States v. Saleem*
659 F. Supp. 3d 683 (W.D.N.C. 2023)....................................................... 8

*United States v. Villalobos*
2023 WL 3044770 (D. Idaho Apr. 21, 2023)................................................. 8

*United States v. Wood*
299 U.S. 123 (1936) .............................................................................. 15

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Wood v. Arnold*
  321 F. Supp. 3d 565 (D. Md. 2018) ........................................................ 3

*Zamani v. Carnes*
  491 F.3d 990 (9th Cir. 2007) .................................................................. 3

**STATUTES**

**ALABAMA**

1837 Ala. Acts 7, No. 11, § 2 ................................................................... 19

**CALIFORNIA**

Cal. Stat., Chapter 39 ........................................................................... 2, 20

California Penal Code
  § 17210 .............................................................................................*passim*
  § 33410 .............................................................................................*passim*

**ENGLAND**

7 Rich. 2, ch. 13 (1383) .......................................................................... 16

33 Hen. 8, ch. 6, §§ 1-2, 18 (1541) .......................................................... 16

**FLORIDA**

1868 Fla. Stat., ch. 1637, *reprinted in* Blount et al., The Revised
  Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892) ........ 19

**GEORGIA**

1837 Ga. Acts 90, § 1 .............................................................................. 19

**ILLINOIS**

1881 Ill. Laws 73, § 1 ............................................................................. 19

**KENTUCKY**

1855 Ky. Acts 96, Chapter 636, § 1 ........................................................ 19

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

**MAINE**

1909 Me. L., ch. 129 ........................................................................................ 20

**MASSACHUSETTS**

1850 Mass. Gen. Stat. ch. 194, § 2 ................................................................. 19

1750 Mass. Acts 544, Chapter 17, § 1 ............................................................ 17

1786 Mass. Acts 87, Chapter 38 ..................................................................... 17

**MICHIGAN**

1927 Mich. Pub. Acts, No. 372, pp. 888-89 ................................................... 20

**MINNESOTA**

1913 Minn. L., ch. 64 ...................................................................................... 20

**NEW JERSEY**

1763-1775 N.J. Laws 346, Chapter 539, § 10 ................................................ 17

An Act Against Wearing Swords (1686), *reprinted in The Grants,*
   *Concessions, and Original Constitutions of the Province of New*
   *Jersey* 289-290 (1881) ............................................................................. 17

An Act to Describe, Apprehend and Punish Disorderly Persons § 2
   (1799), *reprinted in* Laws of the State of New Jersey 474 (Nettleton
   ed., 1821) ................................................................................................. 17

**NEW YORK**

1772 N.Y. Laws ............................................................................................... 17

1849 N.Y. Laws 403-404, Chapter 278, §§ 1-2 ............................................. 18

**NORTH DAKOTA**

1877 N.D. Laws 794, § 455 ............................................................................ 19

vi

1
2

# TABLE OF AUTHORITIES
## (continued)

Page

**OHIO**

1788-1801 Ohio Laws 321, 323 ............................................................. 17

**RHODE ISLAND**

1927 R.I. Pub. L., ch. 1052 ................................................................... 20

**TENNESSEE**

Tenn. Pub. Act 200, Chapter 137, § 1 ................................................... 19

**VERMONT**

1849 Vt. Acts & Resolves 26, No. 36, §§ 1-2 ....................................... 18

1912 Vt. Acts & Resolves, No. 237, p. 310 ........................................... 20

**COURT RULES**

Federal Rules of Civil Procedure
    12(b)(6) ........................................................................................... 3

**OTHER AUTHORITIES**

1 Blackstone, *Commentaries on the Laws of England* 139 (1769) ......... 15

1 Blackstone, *Commentaries* 139 ......................................................... 16

Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys
    in the Constitution*, 102 Va. L. Rev. 687, 688 (2016) ....................... 12

John Forrest Dillon, *The Right to Keep and Bear Arms for Public and
    Private Defence*, 1 Cent. L. J. 259 (1874) ...................................... 15

Robert J. Spitzer, *Understanding Gun Law History After Bruen:
    Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 101
    (2023) ............................................................................................. 17

Schwoerer, *Gun Culture in Early Modern England* 59 (2016) ............... 16

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17-18 (1782)..............................................16

**INTRODUCTION**

This lawsuit seeks to facially invalidate and permanently enjoin California's longstanding statutory prohibition on the possession of firearm silencers. Plaintiff, proceeding in pro per, asserts that the prohibition, first enacted almost a century ago and now codified at California Penal Code section 33410, violates the Second Amendment. He alleges that silencers, as accessories to arms, are themselves arms deserving of constitutional protection, and that section 33410 is not relevantly similar to any historical regulation from the founding or Reconstruction eras. But Plaintiff's claim cannot succeed. The one-page, conclusory complaint in this case fails to state a claim.

Under the analytical framework articulated in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the plaintiff bears the initial pleading burden to sufficiently allege that their proposed course of conduct is presumptively protected by the plain text of the Second Amendment. *Id.* at 24; *B&L Prods., Inc. v. Newsom*, __ F.4th __, 2024 WL 2927734, *8 (9th Cir. June 11, 2024). Where, as here, the plaintiff alleges that possession of a specific instrument is protected, the plaintiff must show that the device fits within the historical definition of the term "Arms," but also that the device is commonly used for self-defense and is not a dangerous and unusual weapon for which categorical bans are permissible. *Bruen*, 597 U.S. at 28, 32; *District of Columbia v. Heller*, 554 U.S. 570, 581, 622, 627 (2008).

The Complaint here fails every aspect of this threshold analysis. Plaintiff cannot plead that a firearm silencer is an "Arm" under the text of the Second Amendment, nor that it is a component integral to the functioning of a firearm such that it is necessary to effectuate the right to armed self-defense. This alone warrants dismissal. Yet the Complaint also fails to plead that silencers are commonly used—or indeed, that they have any utility—for ordinary self-defense; to the

contrary, silencers are dangerous and unusual when attached to a functioning firearm and thus fall outside the scope of the Second Amendment.

Even if Plaintiff could sufficiently pled that silencers are presumptively protected by the Second Amendment, the State's prohibition on these devices fits comfortably within our Nation's well-established historical tradition of firearm regulation.  From the time of the founding, through ratification of the Fourteenth Amendment, and into the 20th century, states have long exercised their police powers to restrict access to and use of certain exceedingly dangerous weapons that are prone to criminal misuse.  Such historical limitations left open viable avenues for law-abiding persons to exercise their constitutional right to armed self-defense and have comported with the Second Amendment.  Section 33410 follows that tradition, restricting possession of one particularly dangerous firearm accessory, while leaving Californians with a plethora of weapons with which to legally defend themselves.  Accordingly, the Complaint fails to state a viable claim on which relief can be granted and should be dismissed without leave to amend.

## BACKGROUND

Possession of a firearm silencer in California has been prohibited since 1933. *See* 1933 Cal. Stat., ch. 39, at 329-30.  California Penal Code section 33410 states, "Any person, firm, or corporation who within this state possesses a silencer is guilty of a felony and upon conviction thereof shall be punished by imprisonment . . . or by a fine not to exceed ten thousand dollars ($10,000), or by both that fine and imprisonment."  A "silencer" is defined as "any device or attachment of any kind designed, used, or intended for use in silencing, diminishing, or muffling the report [i.e., sound of the discharge] of a firearm," as well as "any combination of parts, designed or redesigned, and intended for use in assembling a silencer or fabricating a silencer and any part intended only for use in assembly or fabrication of a silencer."  Cal. Penal Code § 17210.

Plaintiff filed the Complaint on April 29, 2024.  He alleges that section 33410 violates the Second and Fourteenth Amendments to the United States Constitution on its face.  ECF No. 1 at 2.  He seeks a declaratory judgment to that effect, as well as an injunction against enforcement of section 33410 in its entirety.  *Id.*  In papers attached the Complaint, it appears that Plaintiff seeks to create and use a homemade, 3D-printed silencer.  ECF No. 1 at 3.  The proposed silencer, which Plaintiff unsuccessfully sought federal authorization to fabricate and register, is intended for use with 5.56 mm caliber rounds.  *Id.*[1]  The federal authorization was denied on the grounds that silencers are unlawful in California under state law.  ECF No. 1 at 10.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint should be dismissed where it fails to state a claim for relief that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.  *Iqbal*, 556 U.S. at 678.  In other words, dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.  *Zamani v. Carnes*, 491 F.3d 990, 996 (9th Cir. 2007).

In considering a motion to dismiss, the Court must accept as true the factual allegations in the complaint, but not conclusory allegations, unwarranted factual deductions, or unreasonable inferences.  *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004).  Where, as here, a plaintiff asserts a facial challenge to a state law, they must "'establish that no set of circumstances exists under which the

---

[1] 5.56 mm NATO rounds are commonly used with the M16 rifle (a fully automatic machinegun) and semiautomatic, assault-style rifles.  *See Wood v. Arnold*, 321 F. Supp. 3d 565, 572 n.6 (D. Md. 2018).

[law] would be valid.'" *United States v. Rahimi*, 602 U.S. __, 2024 WL 3074728, at *6 (June 21, 2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *S.D. Myers, Inc. v. City & Cnty. of San Francisco*, 253 F.3d 461, 467-68 (9th Cir. 2001).

## ARGUMENT

The Second Amendment "codified a *pre-existing* right." *Heller*, 554 U.S. at 592. "[L]ike most rights, the right secured by the Second Amendment is not unlimited.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). The amendment has never been understood to confer an unfettered "right to keep and carry any weapon whatsoever," and the Supreme Court has recognized that certain weapons and instruments "may be banned." *Heller*, 554 U.S. at 626-27. The analytical framework recently announced in *Bruen* did not change that: the Court did not "decide anything about the kinds of weapons that people may possess." *Bruen*, 597 U.S. at 72 (Alito, J., concurring).

Under the *Bruen* framework, the standard for evaluating Second Amendment claims is "centered on constitutional text and history." *Bruen*, 597 U.S. at 22. The initial inquiry is whether "the Constitution presumptively protects" the plaintiffs' purposed course of conduct. *Id.* at 24. If so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Here, application of the *Bruen* framework confirms that Plaintiff cannot plead a claim that California's prohibition on the possession of silencers violates the Second Amendment at either stage of the *Bruen* analysis.

## I.   PLAINTIFF CANNOT ESTABLISH THAT SILENCERS ARE PRESUMPTIVELY PROTECTED BY THE SECOND AMENDMENT

The threshold question under *Bruen* is whether a plaintiff has carried their burden to establish that "the Constitution presumptively protects" their proposed course of conduct. *Bruen*, 597 U.S. at 24; *B&L Prods.*, 2024 WL 2927734, at *8;

4

*United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024).  To answer that question, the Court addresses whether "the Second Amendment's plain text covers" the plaintiff's proposed course of conduct.  *Bruen*, 597 U.S. at 24.  That inquiry considers "the normal and ordinary meaning of the Second Amendment" informed by its "historical background."  *Id.* at 20 (internal quotation marks omitted).

Where a plaintiff contends that possession of a prohibited item is covered by the Second Amendment, they bear an initial burden to establish that the item fits within the definition of "Arm," as that term was originally understood—either as a weapon itself or a component integral to operation of a weapon.  *Heller*, 554 U.S. at 581.  Failure to do so is fatal to the constitutional claim.  But even where a plaintiffs can meet that burden, the Supreme Court has emphasized that not every "*type of weapon*" is "eligible for Second Amendment protection."  *Heller*, 554 U.S. at 622.  In determining what types of weapons fall within the scope of the Second Amendment at step one of the *Bruen* framework, the Supreme Court has clarified that only "weapons 'in common use' today for self-defense" are eligible for protection, *Bruen*, 597 U.S. at 32, while "'dangerous and unusual weapons'" may be banned, *Heller*, 554 U.S. at 627.  Thus, a plaintiff challenging an arms restriction must also show that "'the weapon at issue is "in common use" today for self-defense.'"  *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 32).

### A.   Silencers Are Not "Arms"

Under *Bruen*'s text-and-history standard, a silencer is not an "Arm[]." Although the meaning of the term "Arms" is broad, *see Heller*, 554 U.S. at 581, it is "fixed according to its historical understanding," *Bruen*, 597 U.S. at 28.  To that end, *Heller* explained that an instrument need not have existed at the time of the founding to fall within the scope of the Second Amendment, but it still must fit within the founding-era understanding of an "Arm[]."  *Heller*, 554 U.S. at 581. Citing multiple dictionary definitions from the relevant time period, the Supreme

5

Court has defined "Arms" as "'[w]eapons of offence, or armour of defence,'" *id.* (quoting 1 Dictionary of the English Language 106 (4th ed.)), and "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" *id.* (quoting 1 A New and Complete Law Dictionary).[2]

A firearm silencer falls outside that historical understanding of the term "Arms." While the Complaint does not articulate a definition of silencers (or "suppressors," as Plaintiff refers to them), the term "silencer" is defined by statute as "any device or attachment of any kind designed, used, or intended for use in silencing, diminishing, or muffling the report of a firearm." Cal. Penal Code § 17210 (referencing Cal. Penal Code § 33410). Such a "device or attachment" necessarily cannot constitute an "Arm" within the meaning of the Second Amendment because it cannot be used to "cast at or strike another" and has no inherent usefulness as a weapon in the case of confrontation. *Heller*, 554 U.S. at 581. A silencer has neither inherent offensive nor defensive capability, but rather, is a firearm accessory that has no intrinsic self-defense purpose. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (concluding that silencers are not "bearable arms" covered by the Second Amendment).[3]

Nor can Plaintiff establish that silencers are subsumed within the textual definition of "Arms" as a protected component integral to the operation of a firearm. The Ninth Circuit has explained that the Second Amendment "also protects ancillary rights necessary to the realization of the core right to possess a

---

[2] Expert evidence would also establish a textual difference between Arms and accoutrements during the founding era, further supporting the argument that silencers are not Arms. *See, e.g.*, *Capen v. Campbell*, __F. Supp. 3d __, 2023 WL 8851005, at *17 (D. Mass. Dec. 21, 2023). Defendant reserves the right to supplement the record concerning the historical understanding of the term "Arms."

[3] Plaintiff explicitly acknowledges that silencers are not themselves weapons, but rather, accessories. ECF No. 1 at 2.

firearm for self-defense." *B&L Prods.*, 2024 WL 2927734, at \*7 (quoting *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc)).[4] "Ancillary rights are protected to the extent necessary to serve" the interest of keeping and bearing arms "'for lawful purposes, most notably self-defense.'" *B&L Prods.*, 2024 WL 2927734, at \*8 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 781 (2010). In some circumstances, courts have recognized an ancillary Second Amendment right to possess components that are necessary to the functioning of a firearm. *See Miller*, 307 U.S. at 180-82 (recognizing the implied right to possess ammunition); *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing "some corollary, albeit not unfettered, right to possess the magazines necessary to render . . . firearms operable"), *abrogated on other grounds by Bruen*, 597 U.S. 1. In contrast, accessories that are not necessary to operate a firearm for self-defense are not protected by the Second Amendment. *See Cox*, 906 F.3d at 1186.

A silencer is "unnecessary to the essential operation of a firearm." *United States v. Berger*, __ F. Supp. 3d __, 2024 WL 449247, at \*14-17 (E.D. Pa. Feb. 6, 2024). Instead, the device is designed only to muffle the byproduct of normal firearm operation after it has been discharged—namely, lessening the "report" or sound associated with discharging a firearm. *See* Cal. Penal Code § 17210. In other words, a silencer is simply not necessary to render a firearm operable or effectuate the right to armed self-defense.

Accordingly, every federal court to address this issue—both before and after *Bruen*—has concluded that silencers are not protected by the Second Amendment, with the vast majority concluding that silencers do not constitute "Arms" under the plain constitutional text. *See, e.g.*, *Cox*, 906 F.3d at 1186 ("[B]ecause silencers are not 'bearable arms,' they are outside the Second Amendment's guarantee.");

---

[4] Although *Teixeira* was decided pre-*Bruen*, the Ninth Circuit has recognized that certain aspects of the decision "remain[] good law" post-*Bruen*. *B&L Prods.*, 2024 WL 2927734, at \*7 n.18.

*Berger*, 2024 WL 449247, at \*14-17 (silencer not covered by text of Second Amendment "because it is merely an accessory which is unnecessary to the essential operation of a firearm"); *Capen*, 2023 WL 8851005, at \*17 ("[S]ome accessories, such as silencers, do not affect the essential operation of a weapon and so do not fall within the scope of the Second Amendment's protection."); *United States v. Peterson*, 2023 WL 5383664, at \*2 (E.D. La. Aug. 21, 2023) ("[S]ilencers are not bearable arms within the score of the Second Amendment even in light of *Bruen* or its progeny.");  *United States v. Cooperman*, 2023 WL 4762710, at \*1 (N.D. Ill. July 26, 2023) ("The plain text of the Second Amendment does not protect accessories that are not bearable arms, such as silencers."); *Cox v. United States*, 2023 WL 4203261, at \*7 (D. Alaska June 27, 2023) ("Silencers are firearms accessories and not 'arms' for purposes of Second Amendment Protection."); *United States v. Villalobos*, 2023 WL 3044770, at \*12 (D. Idaho Apr. 21, 2023) ("[S]ilencers are not bearable arms within the meaning of the Second Amendment and are not constitutionally protected."); *United States v. Saleem*, 659 F. Supp. 3d 683, 695 (W.D.N.C. 2023) (same); *United States v. Al-Azhari*, 2020 WL 7334512, at \*3 (M.D. Fl. Dec. 14, 2020) (same); *United States v. Hasson*, 2019 WL 4573424, at \*4 (D. Md. Sept. 20, 2019) (same).[5]

In the lone paragraph of allegations in the Complaint, Plaintiff asserts that "accessories for arms," like silencers, "are arms themselves."  ECF No. 1 at 2.  But no authority supports this proposition.  *Iqbal*, 556 U.S. at 678; *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (conclusory statements are insufficient to state a

---

[5] *See also Second Amendment Found., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, \_\_F. Supp. 3d \_\_, 2023 WL 7490149, at \*13 (N.D. Tex. Nov. 13, 2023) (rejecting Second Amendment challenge to regulation of stabilizing braces by comparing to silencers, which do not "implicate the Second Amendment because 'a firearm remains an effective weapon without a silencer'"); *Firearms Regul. Account. Coal., Inc. v. Garland*, No. 23-cv-024, \_\_F. Supp. 3d \_\_, 2023 WL 5942365, at \*5 (D.N.D. Sept. 12, 2023) (same).

claim for relief).  Indeed, Plaintiff's conclusory allegation is belied by the text of the Second Amendment itself as well as the legion of cases reaching the opposite legal conclusion.  Plaintiff does not (and cannot) allege that silencers are themselves capable of being used as a weapon or that they are integral to the functionality of a firearm for the purpose of self-defense.

Plaintiff also attempts to compare silencers to accessories that "propagate" the constitutional right to free speech, like pens and computers.  ECF No. 1 at 2.  Even if Plaintiff were correct that the right to free speech encompasses a right to possess all instrumentalities of speech, his comparison to the Second Amendment context is inapt.  While Plaintiff is correct that silencers are "accessories for arms," they do not aid in making a firearm functional and are not necessary for a firearm to be used for purposes of armed self-defense.

In short, at the threshold stage of the *Bruen* inquiry, silencers are simply not covered by the Second Amendment's plain language or any ancillary right necessary for the realization of the right to armed self-defense.  Because the possession of silencers is not presumptively protected by the text of the Second Amendment as a matter of law, "the analysis can stop there."  *Bruen*, 597 U.S. at 18 (internal quotation marks and citation omitted).

**B.   Plaintiff Cannot Adequately Plead Facts Sufficient to Demonstrate that Silencers Are In Common Use for Self Defense and Not Dangerous and Unusual**

Even if Plaintiff could establish that silencers qualify as "Arms" within the meaning of the constitutional text, he cannot carry his burden to adequately plead that such instruments are self-defense weapons that are "'in common use' today for self-defense" and are not, conversely, dangerous and unusual.  *See Bruen*, 597 U.S. at 32; *Heller*, 554 U.S. at 627.  On these additional, independent grounds, the Complaint fails to state a claim that the restrictions on silencers violate the Second Amendment.

9

### 1.   Common Use for Self-Defense

The Supreme Court has emphasized that "individual self-defense is 'the *central component*' of the Second Amendment." *Bruen*, 597 U.S. at 32.  Courts must therefore assess whether a weapon is "'in common use' today for self-defense" in determining whether it is presumptively protected.  *Id.*; *see id.* at 81 (Kavanaugh, J., concurring) (emphasizing this "important limitation"); *Heller*, 554 U.S. at 624.  The Ninth Circuit has followed *Bruen*'s guidance in explaining that part of the "*Bruen* step one" inquiry is "whether the weapon at issue is "'in common use" today for self-defense.'"  *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).[6]

In assessing common use for self-defense, the Supreme Court in *Heller* did not simply consider the *prevalence* of handguns (which was undisputed).  *Heller*, 554 U.S. at 629.  Instead, it examined the *objective features* of a handgun to explain why it is a "self-defense weapon."  *Id.*  The Court explained that handguns are "easier to store in a location that is readily accessible in an emergency" due to their small size.  *Id.*  They are also "easier to use for those without the upper-body strength to lift and aim a long gun"; they "can be pointed at a burglar with one hand while the other hand dials the police"; and they "cannot easily be redirected or wrestled away by an attacker."  *Id.*  In the same opinion, the Court recognized that some types of weapons fall outside the scope of the Second Amendment—"such as short-barreled shotguns," and "M-16 rifles and the like"—without *any* discussion of their popularity or prevalence.  *Id.* at 625, 627.  Thus, what mattered to the Court was an "examin[ation]" of "the character of the weapon."  *Id.* at 622; *see id.* at 623

---

[6] A different panel in the Ninth Circuit recently suggested that "presumptive protections of the Second Amendment may be rebutted as to arms not in common use today for self-defense." *Perez-Garcia*, 96 F.4th at 1181 (internal quotation marks omitted).  To the extent that passage might be interpreted to require the government to prove that a particular weapon is not in common use for self-defense, it would be non-binding dicta in conflict with *Alaniz* and *Bruen*, both of which extended presumptive protection only if the weapon at issue is in common use for self-defense.

("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons.").

The Complaint here does not speak to pertinent characteristics of a silencer. Nor does Plaintiff allege that silencers are commonly owned or that they are used for "ordinary self-defense needs." *Bruen*, 597 U.S. at 60. Indeed, as explained above, Plaintiff cannot establish that silencers, as defined by California law, are themselves weapons or that they have any utility for armed self-defense. A silencer is an accessory that can be attached to an otherwise operable firearm to muffle the sound associated with discharge. *See* Cal. Penal Code § 17210. By definition, such an instrument has no more inherent utility for self-defense than any other of the countless objects that do not qualify for Second Amendment protection.

In the only allegation that concerns how silencers are used, Plaintiff asserts in conclusory terms that the devices are "overwhelmingly used by law abiding citizens for lawful purposes." ECF No. 1 at 2. But he does not include any allegations about the prevalence of these devices or their "character" to allege that they are entitled to Second Amendment protection. *See Heller*, 554 U.S. at 622. Indeed, even if Plaintiff had pled that firearm silencers have specific lawful utilities like noise abatement or hearing protection (and he did not), "'the Second Amendment does not elevate convenience and preference over all other considerations.'" *B&L Prods.*, 2024 WL 2927734, at *8 (quoting *Teixeira*, 873 F.3d at 680); *see Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 916 (D. Or. 2023) (explaining why subjective intent is not sufficient to establish common use for self-defense). The Second Amendment right is grounded in armed self-defense. *Bruen*, 597 U.S. at 32; *Alaniz*, 69 F.4th at 1128. That an instrument like a silencer could be used for lawful purposes, including even, theoretically, self-defense, does not establish that silencers are in common use for "ordinary self-defense." *Bruen*, 597 U.S. at 60; *Or. Firearms Fed'n*, 682 F. Supp. 3d at 919 ("This Court reads the qualifier of

'ordinary self-defense needs' to include some consideration of how and why firearms or firearm accessories are actually used in typical self-defense scenarios.").

### 2. Dangerous and Unusual

The Complaint also fails to state a claim because silencers are a type of "dangerous and unusual" weapon that the Supreme Court has held may be banned. *See Bruen*, 597 U.S. at 21; *Heller*, 554 U.S. at 627.  Such weapons "fall outside of the Second Amendment's protections" at the threshold stage of the *Bruen* inquiry. *Or. Firearms Fed'n*, 682 F. Supp. 3d at 922 (citing *Bruen*, 597 U.S. at 21); *see NAGR*, 685 F. Supp. 3d at 91 (conducting "dangerous and unusual" inquiry at *Bruen* step one); *see also Heller*, 554 U.S. at 627 (discussing "dangerous and unusual" principle as part of its threshold discussion of what "sorts of weapons [are] protected" by the Second Amendment).

The phrase "dangerous and unusual" in describing this historical tradition is a hendiadys:  a rhetorical device where "two terms separated by a conjunction work together as a single complex expression."  Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688 (2016).  In "dangerous and unusual," "unusual" conveys some heightened "level of lethality or capacity for injury" that makes a particular type of weapon "especially dangerous," *Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*), 685 F. Supp. 3d 63, 90 (D. Conn. 2023), not a numerical limit that bars prohibitions on a weapon as soon as a minimum number are in circulation.  Silencers are "dangerous and unusual" devices that fall outside the scope of the Second Amendment.  *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009); *United States v. Comeaux*, 2024 WL 115929, at *3 (W.D. La. Jan. 10, 2024).[7]

---

[7] Even if the "dangerous and unusual" inquiry requires a separate showing that the weapon in question is not "commonly possessed," *Fyock*, 779 F.3d at 997, Plaintiff here has not alleged that silencers are commonly possessed by law-abiding citizens for ordinary self-defense.  *Supra* pp. 10-11.

Plaintiff makes no attempt to disclaim the dangerous and unusual nature of silencers.  As noted, he alleges that silencers are "overwhelmingly used by law abiding citizens for lawful purposes."  ECF No. 1 at 2.  But the fact that a weapon (or here, an accessory to a weapon) might be used for lawful purposes says nothing about whether the device has a heightened capacity for dangerousness.  Indeed, several courts have recognized that silencers are indeed dangerous and unusual, and thus undeserving of constitutional protection.  *See, e.g.*, *McCartney*, 357 F. App'x at 76 (silencers fit within category of unusually dangerous weapons); *Comeaux*, 2024 WL 115929, at *3 (various devices, including silencers, have "the potential to substantially increase the level of violence when used in connection with criminal activity"); *United States v. Grey*, 2018 WL 4403979, at *13 (C.D. Cal. Sept. 13, 2018) ("[T]he Second Amendment does not extend to 'dangerous and unusual weapons' such as silencers."); *United States v. Perkins*, 2008 WL 4372821, at *4 (D. Neb. Sept. 23, 2008) (similar); *see also Perez-Garcia*, 96 F.4th at 1180 ("The Second Amendment may not protect [the] right to bear or keep 'dangerous and unusual weapons,' which might include ghost guns or silencers or armor-piercing ammunition.").

As each of these courts have recognized, the function of a silencer— "silencing, diminishing, or muffling the report of a firearm," Cal. Penal Code § 17210—increases the device's capability for lethality.  As one court explained, a silencer "has the potential to allow a criminal to fire more shots without detection, avoid apprehension after shooting someone, or both."  *Comeaux*, 2024 WL 115929, at *3.  Where the sound of gunshots is muffled by a silencer, common sense dictates that it is necessarily more difficult to identify the location of a shooter, which in turn, makes it more difficult for potential victims to flee and for law enforcement to neutralize the danger.  Due to these characteristics, silencers have been heavily regulated at the federal and state levels since the 1930s.  *See infra* pp. 19-20.  Given their innate characteristics, silencers are dangerous and unusual

13

1  items that are not covered by the Second Amendment's text, and thus Plaintiff

2  cannot state a viable Second Amendment claim.

3  **II.    CALIFORNIA'S PROHIBITION ON SILENCERS IS CONSISTENT WITH THIS
       NATION'S HISTORY AND TRADITION OF FIREARMS REGULATION**

4

5      Even if Plaintiff could satisfy his burden at the first stage of the *Bruen* inquiry

6  to adequately allege that silencers are presumptively protected by the Second

7  Amendment, California's prohibition on silencers is consistent with "the historical

8  tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*,

9  597 U.S. at 19.  In conducting this "analogical inquiry"—at step two of the *Bruen*

10  framework—a prior regulation identified by the government "must comport with

11  the principles underlying the Second Amendment, but it need not be a 'dead ringer'

12  or a 'historical twin.'" *Rahimi*, 2024 WL 3074728, at *6 (quoting *Bruen*, 597 U.S.

13  at 29-30).  Modern laws that are "relevantly similar" to historical regulations, in the

14  sense that they "impose a comparable burden on the right of armed self-defense"

15  that "is comparably justified," are constitutional. *Bruen*, 597 U.S. at 29.[8]  And

16  when a challenged law addresses either "unprecedented societal concerns or

17  dramatic technological changes," a "more nuanced approach" is needed because

18  "[t]he regulatory challenges" of today would not be "the same as those that

19  preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at

20  27-28.

21      Here, even a cursory review of the historical record reveals that California's

22  ban on silencers fits well within the Nation's regulatory tradition.[9]  Governments

23      [8] The historical analogues discussed in this motion are not comprehensive,

24  and Defendant reserves the right to supplement this historical record for purposes of

25  a step-two analysis.  In many cases, States have relied on historical experts to
    canvass laws that serve as relevant analogues. But the historical laws themselves

26  are not adjudicative facts and this Court may consider them in evaluating whether
    Plaintiff could plausibly state a claim for relief.

27

28      [9] As addressed above and acknowledged by Plaintiff, *see* ECF No. 1 at 2, this

have long adopted historical regulations that either curtail use or outright ban possession of particular weapons and accessories, where the weapon poses a heightened danger to society, so long as the restriction did not destroy the right to armed self-defense by leaving available other weapons for constitutionally protected uses.[10]

In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599). That "*pre-existing* right" was "not unlimited." *Id.* at 20-21 (quoting *Heller*, 554 U.S. at 592, 626). As Blackstone described it, the right was understood as "a public allowance"—subject to "due restrictions" necessary to protect the peace. 1 Blackstone, *Commentaries on the Laws of England* 139 (1769).[11] The English Bill of Rights—"the predecessor to our Second Amendment"—guaranteed a right for certain subjects to "'have Arms for their Defence suitable to their Conditions, *and as allowed by Law*.'" *Heller*, 554 U.S. at 593 (quoting 1 Wm. &

---

case concerns a firearm accessory, not a weapon. In conducting *Bruen*'s "analogical inquiry," where the Nation's historical tradition shows a robust state police power to limit or ban dangerous and unusual weapons, it necessarily follows that a state may also, consistent with the Second Amendment, ban an accessory that enhances the lethality of a firearm or renders it prone to criminal misuse.

[10] *See* John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285 (1874) ("It would seem to follow that while society may regulate this right . . . so as to promote the safety and good of its members, yet any law which should attempt to take it away, or materially abridge it, would be the grossest and odious form of tyranny."); *id.* at 287 ("On the one hand . . . society cannot justly require the individual to surrender and lay aside the means of self-protection in seasons of personal danger . . . . On the other hand, the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons, and the utmost that the law can hope to do is to strike some sort of balance between these apparently conflicting rights.").

[11] *See also United States v. Wood*, 299 U.S. 123, 138 (1936) ("Undoubtedly, as we have frequently said, the framers of the Constitution were familiar with Blackstone's Commentaries.").

1  Mary, ch. 2, § 7 (1689)) (emphasis added); *see also* 1 Blackstone, *Commentaries*

2  139.  The phrase "as allowed by law" authorized governments to "restrain the use

3  of *some particular sort of arms*."  Sharp, *Tracts, Concerning the Ancient and Only*

4  *True Legal Means of National Defence, by a Free Militia* 17-18 (1782).

5      For example, the Crown banned possession of especially dangerous weapons

6  like launcegays, pocket pistols, and crossbows to preserve the public order.  *Bruen*,

7  597 U.S. at 41-42; *see, e.g.*, 7 Rich. 2, ch. 13 (1383); 33 Hen. 8, ch. 6, §§ 1-2, 18

8  (1541).  The focus on launcegays in medieval England "ma[de] sense" given that

9  "lances were generally worn or carried only when one intended to engage in lawful

10  combat or—as most early violations of the Statute [of Northampton] show—to

11  breach the peace." *Bruen*, 597 U.S. at 41.  And Henry VIII's ban on crossbows and

12  pocket pistols sought "to protect the public" from the proliferation of those

13  weapons and their use in "detestable and shameful murders, robberies, felonies, riot

14  and route."  Schwoerer, *Gun Culture in Early Modern England* 59 (2016) (internal

15  quotation marks omitted); *see also id.* at 55 (noting Henry VIII's concern with "the

16  newfangled and wanton pleasure that men now have in using of crossbows and

17  handguns" (cleaned up)).

18      That English tradition continued in America throughout each of the periods

19  that *Bruen* identified as relevant to its historical inquiry.  *See Bruen*, 597 U.S. at 46-

20  70.  Colonial and state governments imposed regulations on firearms hardware,

21  accessories, and other weapons deemed to pose threats to public safety at the time.

22  During the colonial and founding era, most violent crimes were committed with

23  weapons such as clubs, dirks, and daggers.  *See Bevis v. City of Naperville* (*Bevis I*),

24  657 F. Supp. 3d 1052, 1070 (N.D. Ill. 2023) ("As early guns proved unreliable,

25  many citizens resorted to clubs and other blunt weapons.").[12]  States and colonies

26      [12] During the colonial and founding period, governments also heavily
27  regulated certain firearms and firearm accessories when those items posed
   heightened dangers to public safety.  In 1771, for instance, New Jersey prohibited
28

"responded to the proliferation of these weapons." *Id.*  In 1686, for example, after a period of internal "strife and excitement," *Bruen*, 597 U.S. at 48 (internal quotation marks omitted), East New Jersey prohibited the concealed carrying of "pocket pistol[s], skeins, stilladers, daggers or dirks, or other unusual or unlawful weapons," An Act Against Wearing Swords (1686), *reprinted in The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-290 (1881).  Other colonies and early States prohibited the carrying of clubs and similar weapons increasingly used as fighting instruments.  *See Bevis I*, 657 F. Supp. 3d at 1070 (detailing restrictions).[13]  The Conductor Generalis—a founding-era guide for justices of the peace, sheriffs, and constables that relied heavily on the 1791 treatise of William Hawkins on English law—provided that the public offense of an "affray" could be committed "where there is no actual violence," such as "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[14]

---

the keeping of firearms configured as trap guns, which used string or wire so that a loaded firearm would discharge automatically when a trap was sprung.  *See* 1763-1775 N.J. Laws 346, ch. 539, § 10 ("Penalty for setting loaded Guns").  That "most dangerous" (*id.*) weapon configuration "[i]nevitably . . . wound up hurting or killing innocent[]" bystanders who set off the trap.  Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 101 (2023).  Colonies and early States also heavily regulated gunpowder by limiting the quantity that could be kept and imposing storage requirements to promote public safety.  *See Or. Firearms Fed'n*, 682 F. Supp. 3d at 929; *e.g.*, 1772 N.Y. Laws at 683.

[13] *See*, *e.g.*, 1750 Mass. Acts 544, ch. 17, § 1 (prohibited the carry of "clubs or other weapons" in a group of 12 or more); 1786 Mass. Acts 87, ch. 38 (same); 1788-1801 Ohio Laws 321, 323 (prohibited the carry of any "dangerous weapon" while committing a burglary); An Act to Describe, Apprehend and Punish Disorderly Persons § 2 (1799), *reprinted in* Laws of the State of New Jersey 474 (Nettleton ed., 1821) (prohibited the carry of any pistol, hanger, cutlass, bludgeon, or other "offensive weapon" with intent to commit assault).

[14] The Conductor Generalis: Or, the Office, Duty, and Authority of Justices

Similar restrictions on particularly dangerous weapons and devices existed during the antebellum and postbellum period, around the time that the Fourteenth Amendment was ratified.  As explained in one of the most important early American firearms cases, *State v. Reid*, 1 Ala. 612 (1840), the Second Amendment left "with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals." *Id.* at 616.  The Supreme Court in *Bruen* recognized as much, citing the Arkansas Supreme Court's approval of a state law (modeled on an earlier approach taken in Tennessee) that prohibited public carry of handguns broadly based on their dangerousness, while reserving an explicit exception that allowed for carry of military-style revolvers.  *Bruen*, 597 U.S. at 53 n.20 (citing *Fife v. State*, 31 Ark. 455 (1876)).  This era also saw widespread limitations on the carry and possession of particular "melee weapons" as they became prevalent and imperiled public safety due their unique dangerousness.  *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), 664 F. Supp. 3d 584, 600-01 (D. Del. 2023).  For example, among other melee weapons regulated during the nineteenth century, States heavily regulated the sale and possession of slungshots—hand-held impact weapons with a weighted object at the end of a flexible strap.  New York and Vermont passed laws in 1849 prohibiting the manufacture, sale, and possession of slungshots.[15]  Massachusetts banned the manufacture or sale of slungshots in 1850,

---

of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-Men, and Overseers of the Poor, and also The Office of Clerks of Assize, and of the Peace, & c. Albany, 1794, at 26.

[15] 1849 N.Y. Laws 403-404, ch. 278, §§ 1-2; 1849 Vt. Acts & Resolves 26, No. 36, §§ 1-2.

followed by Kentucky in 1855, Florida in 1868, and the Dakota Territory in 1877.[16]
Illinois banned the possession and sale of slungshots in 1881.[17]

Another melee weapon that that rose to prominence during this period was the "Bowie knife," a weapon used by Jim Bowie in a duel in 1827 that became widespread in the 1830s. *See DSSA*, 664 F. Supp. 3d at 600. The Bowie knife "gained notoriety as a 'fighting knife.'" *Bevis I*, 657 F. Supp. 3d at 1068; *see also Or. Firearms Fed'n*, 682 F. Supp. 3d at 930-31. By 1840, at least five States or territories had enacted laws restricting the carrying of Bowie knives or other fighting knives. *Bevis I*, 657 F. Supp. 3d at 1068-69. A 1837 Georgia law made it unlawful "to sell, or offer to sell" a "Bowie" knife, "or to keep, or have [such a knife] about their person or elsewhere."[18] Other laws substantially restricted the use of Bowie knives, such as a Tennessee law that banned their sale, and an Alabama law that taxed them at a prohibitive rate.[19] Nearly every State enacted a law restricting Bowie knives by the end of the nineteenth century, whether by

---

[16] 1850 Mass. Gen. Stat. ch. 194, § 2; 1855 Ky. Acts 96, ch. 636, § 1; 1868 Fla. Stat., ch. 1637, *reprinted in* Blount et al., The Revised Statutes of the State of Florida 783, tit. 2, art. 5, § 2425 (1892); 1877 N.D. Laws 794, § 455.

[17] 1881 Ill. Laws 73, § 1.

[18] 1837 Ga. Acts 90, § 1. Although the George Supreme Court held that the law's carry restrictions as to pistols violated the Second Amendment in *Nunn v. State*, 1 Ga. 243 (1846), "*Nunn* did not concern, let alone mention, the law's separate prohibition addressing the sale of weapons; nor did it reach beyond 'pistols' to address dangerous-and-unusual weapons like bowie knives. Therefore, this separate clause of the Georgia law remains a valid analogue to modern-day regulations on modern-day dangerous-and-unusual weapons." *Rupp v. Bonta*, 2024 WL 1142061, at *24 (C.D. Cal. Mar. 15, 2024); *see also Hill v. State*, 53 Ga. 472 (1874) (disagreeing with *Nunn* and concluding that pocket pistols, dirks, Bowie-knives, and "those other weapons of like character" fall outside the scope of the right to keep and bear arms).

[19] *See* 1837-1838 Tenn. Pub. Act 200, ch. 137, § 1; 1837 Ala. Acts 7, No. 11, § 2.

outlawing their possession, carry, or sale; enhancing criminal penalties; or taxing their ownership. *See Bevis I*, 657 F. Supp. 3d at 1069; *DSSA*, 664 F. Supp. 3d at 601-602 (Bowie knife regulations were "extensive and ubiquitous" after such knives "proliferated in civil society" (internal quotation marks omitted)).

As new technologies developed, twentieth century laws continued this historical tradition of restricting access to particular weapons and accessories with heightened lethality.[20] As to silencers specifically, the historical record indicates that such devices were considered particularly dangerous from the outset of their invention. As the court in *Comeaux* recounted, states began to ban their sale or possession shortly after they were patented in 1908. *Comeaux*, 2024 WL 115929, at *3; *see, e.g.*, 1909 Me. L., ch. 129, p. 141; 1912 Vt. Acts & Resolves, No. 237, p. 310; 1913 Minn. L., ch. 64, p. 55; 1927 Mich. Pub. Acts, No. 372, pp. 888-89; 1927 R.I. Pub. L., ch. 1052, p. 259. California followed suit in 1933, enacting the predecessor to the ban now challenged in this lawsuit. *See* 1933 Cal. Stat., ch. 39, pp. 329-30. By the time the National Firearms Act was enacted in 1934—a law that, itself, placed strict restrictions on various dangerous weapons, including silencers—at least 15 states had imposed restrictions on the sale or possession of silencers. *Comeaux*, 2024 WL 115929, at *3.[21]

---

[20] In *Bruen*, the Supreme Court focused its historical analysis on the periods surrounding the ratification of the Second and Fourteenth Amendments, specifically rejecting the probative value of public carry laws passed in the twentieth century as contradictory of evidence from those earlier times. *See Bruen*, 597 U.S. at 66 n.28. Because there is no such contradiction with respect to dangerous and unusual weapons regulations, restrictions on newly invented twentieth century weaponry, including silencers, are relevant here. *Cf. Rahimi*, 2024 WL 3074728, at *22 (Kavanaugh, J., concurring) (Where "reasonably consistent and longstanding," "post-ratification history—sometimes referred to as tradition—can also be important for interpreting vague constitutional text and determining exceptions to individual constitutional rights.").

[21] Among other weapons, the National Firearms Act banned possession of fully automatic machineguns. *See Garland v. Cargill*, __ U.S. __, 2024 WL

20

California's prohibition on silencers is "relevantly similar" to this unbroken history of restrictions on possession and use of particular weapons as they emerged and threatened public safety. *Bruen*, 597 U.S. at 29; *see id.* at 21; *see also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44-48 (1st Cir. 2024) (concluding historical regulations of particularly dangerous weapons were "relevantly similar" to modern bans on large-capacity magazines). To the extent California Penal Code section 33410 imposes any burden at all on the right to armed self-defense, that burden is no greater than that imposed by the historical analogues detailed above because it restricts possession of a particularly dangerous item, but otherwise allows law-abiding citizens access to a range of other weapons to exercise their right to armed self-defense. *See Bruen*, 597 U.S. at 29. The prohibition's justification is likewise "comparable" to this body of historical regulations because, like these analogues, the prohibition turns on the unique dangerousness of the regulated item, especially when used for criminal purposes. *Id.* Indeed, as explained above, the innate characteristics and function of a silencer implicate a substantially heightened risk of lethality when used as designed with a functioning firearm because it helps conceal the shooter's location and the fact that shots have been fired. *Comeaux*, 2024 WL 115929, at *3. The purpose of regulating silencers is thus highly analogous to the regulation of concealable weapons in the nineteenth century, which also "aimed at limiting what was viewed as a particularly dangerous feature of [pocket pistols]: their design as being readily concealable, which was viewed as rendering them more deadly." *Or. Firearms Fed'n*, 682 F. Supp. 3d at 906.

Accordingly, the historical record demonstrates that California's ban on silencers—to the extent it poses any burden on the right to armed self-defense—is constitutionally permissible. *Bruen*, 597 U.S. at 26-31. Plaintiff's Second

---

2981505, at *3 (June 14, 2024).

Amendment challenge to California's restrictions on silencers thus fails as a matter of law.

## CONCLUSION

This Court should dismiss Plaintiff's Complaint without leave to amend.

Dated:  June 24, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
JOHN D. ECHEVERRIA
Supervising Deputy Attorneys General

KEVIN L. QUADE
Deputy Attorney General
*Attorneys for Defendant Attorney
General Rob Bonta*

22